UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

|                    | Case No. 24-cr-20647 |
|--------------------|----------------------|
| v.                 | HON. NANCY G. EDMUNDS |

RUSSELL VALLEAU,

Defendant.

_____/

## GOVERNMENT'S TRIAL BRIEF

The government files this brief to provide an overview of the case and address anticipated legal issues that may arise at trial.

## I.      The Indictment

The Indictment charges the defendant with using a dangerous weapon to assault, oppose, impede, intimidate, or interfere with a federal employee under 18 U.S.C. §§ 111(a) and (b) in Count One and interfering with federally protected activities under 18 U.S.C. § 245(b)(1)(C) in Count Two. Additionally, the indictment includes a "Special Finding" that the defendant intentionally selected R.F. as the object of his acts in Counts One and Two because of the actual and perceived race or color of R.F. or any other person. Under U.S.S.G. § 3A1.1, there is a 3-level increase if the jury determines the defendant's bias motivation beyond

1

a reasonable doubt.

## II.    Summary of Expected Facts

On September 26, 2024, United States Postal Services (USPS) mail carrier R.F. was delivering mail on her regular route in Farmington Hills when she noticed Valleau riding in circles on a bicycle at the end of the block, about three houses away from where she was delivering mail. Valleau then rode north towards her mail truck, which faced southbound. After he passed her truck, Valleau made a U-turn and pulled up next to R.F.'s passenger window. R.F. opened the window all the way to see what he wanted. Valleau, whom R.F. recognized as a regular customer on her route, aggressively stated, "I'm tired of getting this black, nasty bitch mail." R.F. told him to leave the mail he didn't want in his mailbox and she would retrieve it. Valleau then stated again, "I don't want this black bitch mail. Stop delivering it. Do your fucking job!" Alarmed, R.F.  told Valleau not to speak to her that way and to step back from her vehicle, to which Valleau responded by yelling, "Fuck you, black bitch! Suck my dick, you black bitch!" As R.F. began to roll her window up, Valleau raised a knife and pulled it back as if he were going to throw it at her or reach through the window and stab her. She described the knife as having a 3–4 inch straight, silver blade.  R.F. ducked her head down, grabbed her USPS-issued pepper spray, and sprayed Valleau in the face.

Valleau fled north on his bicycle while R.F. watched him in her rearview

mirror as she drove away and called 911. In the call to 911, R.F. described that she

"just had a man come to me with a knife and tried to stab me." She also described

what Valleau was wearing and in what direction he headed. While she was still on

the phone with the 911 operator, the police arrived. R.F. explained to one of the

officers, among other things, that Valleau "pulled a knife out on me . . . He pulled

up on me and called me all type of black bitches . . . I was delivering mail and my

window was down and he had the knife and was going to throw it at me. . . ." She

said that Valleau was mad about getting a "black nasty bitch's" mail in his

mailbox.

     In her rearview mirror, R.F. saw Valleau between two nearby houses

"messing" with their garbage cans and then walking toward one of the backyards.

He later returned to the front yard of one of the houses and laid down. Within

minutes, officers from the Farmington Hills Police Department (FHPD) arrived

and found Valleau lying in the yard. After handcuffing him, they searched him for

the knife to no avail. FHPD officers, along with a K-9, searched the area but were

unable to locate the knife that Valleau brandished.

     FHPD arrested Valleau and took him to the hospital to be medically cleared.

While at the hospital, Valleau admitted that he confronted R.F. about getting "this

scummy ass bitch's mail in my mailbox." He also referred to someone, likely R.F.,

as a "fucking smelly n\*\*ger." When the officer told him not to say that, Valleau

asked, "Oh, you like n**ger?" Valleau's statements were captured on the body

worn camera of one of the officers who escorted him to the hospital.

To demonstrate Valleau's racial animus—which is relevant to the

defendant's motive to commit the crimes charged as well as the hate crime

sentencing enhancement—Valleau's Black neighbor will testify to provide

additional evidence of the defendant's motive to commit the crimes charged and

relevant to the hate crime motivation sentencing enhancement. Witness J.W. will

describe that several days before the incident here, Valleau approached J.W. and

J.W.'s brother and called them "nappy-headed n**gers" and "nappy boy."

## III.   Statement of the Law

### A.   Count One: Assaulting, Opposing, Impeding, Intimidating, or Interfering with a Federal Employee with a Deadly or Dangerous Weapon

Count One of the Indictment charges the defendant with violating 18 U.S.C.

§§ 111(a) and (b). For this, the government must prove beyond a reasonable doubt:

> First, that the defendant forcibly assaulted, forcibly resisted, forcibly opposed, forcibly impeded, forcibly intimidated, or forcibly interfered with Raquel Franklin;

> Second, that Raquel Franklin was a federal employee;

> Third, that the defendant did so while Raquel Franklin was engaged in or on account of the performance of official duties; and

> Fourth, that in doing such acts, the defendant used a deadly or dangerous weapon.

As reflected in the joint proposed jury instructions previously submitted to the Court, the parties have agreed on how some of the terms used in the elements of this Count should be defined.

## B.    Interference with Federally Protected Activities, 18 U.S.C. § 245(b)(1)(C)

Count Two of the Indictment charges the defendant with a violation of 18 U.S.C. § 245(b)(1)(C). For this, the government must establish beyond a reasonable doubt:

> First, that the defendant used the threat of force as alleged in the indictment;
>
> Second, that the defendant willfully intimidated or interfered with, or attempted to intimidate or interfere with, the victim, Raquel Franklin;
>
> Third, that the defendant acted because Raquel Franklin was enjoying employment by any agency of the United States, or to intimidate Raquel Franklin from enjoying employment by any agency of the United States, or to interfere with Raquel Franklin's enjoyment of employment by any agency of the United States; and
>
> Fourth, that the defendant acted knowingly and willfully.

As reflected in the proposed verdict form submitted to the Court, if the jury finds the defendant guilty of this charge, they must also determine whether the offense involved the use, attempted use, or threatened use of a dangerous weapon.

As reflected in the joint proposed jury instructions previously submitted to the Court, the parties have agreed on how some of the terms used in the elements of this Count should be defined.

5

C.     **Application of United States Sentencing Guideline § 3A1.1(a) – Hate Crime Motivation**

United States Sentencing Guideline § 3A1.1(a) provides that "[i]f the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim . . . as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels." The parties have submitted joint jury instructions reflecting agreement on how the jury should be instructed regarding this Special Finding. The parties have also agreed that the verdict form should require the jury to make a unanimous determination that the government has proved the defendant's motivation under § 3A1.1(a) beyond a reasonable doubt.

## IV.   The government's case-in-chief

At trial, the government plans to call witnesses and introduce exhibits to prove its case beyond a reasonable doubt.

### A.   Witnesses

The government intends to call six of the witnesses listed on the Government's Witness List. These witnesses include:

- Victim R.F.

- Sgt. Christopher Weiss (FHPD)

- Officer Zachary Kosal (FHPD)

- Officer Jase Paciocco (FHPD)

- Inspector Nicholas Oleson (USPIS)

- Witness J.W (Valleau's neighbor)

## B.    Exhibits

In conjunction with witness testimony, the government intends to introduce audio, video, and photographic evidence as detailed in the Government's Exhibit List.

To prevent delays from objections that can be resolved before trial begins, the government addresses below the admissibility of the government's evidence and how that evidence will be presented. The parties have discussed "meeting and conferring" prior to trial to reach an agreement about the admission of the exhibits.

- **Map of Rockwell Street between Shiawassee Street and Independence Street.** Several of the government's witnesses, including R.F. and Sgt. Weiss will authenticate this exhibit as a fair and accurate depiction of this block of Rockwell Street based on their personal knowledge of the area.

- **911 call of R.F.** The admissibility of this exhibit is addressed in detail below.

- **Body Worn Camera video clip (C. Towns).** This exhibit contains R.F.'s description of the incident to one of the first responding officers on the scene, just minutes after the incident. The admissibility of this exhibit is addressed in detail below.

- **Body Worn Camera video clip (C. Weiss).** This exhibit depicts Sgt. Weiss's search for the knife between 21628 and 21638 Rockwell

7

Street. Sgt. Weiss will authenticate this clip based on his personal knowledge of what is depicted therein.

- **Ring Video from 21539 Rockwell Street.** This exhibit depicts Valleau riding his bike past R.F.'s mail truck, making a U-turn, and approaching the passenger side of the mail truck. R.F. will authenticate this video based on her personal knowledge of what is depicted therein.

- **Knives from Valleau's home.** The knives from Valleau's home will be authenticated by Postal Inspector Oleson who found and seized them pursuant to a search warrant.

## V.    Anticipated Evidentiary and Legal Issues

### A.    911 Call and Statements to Police Describing the Incident

Immediately after the defendant confronted and threatened her, the victim, R.F., called 911 while she was still watching the defendant in her rearview mirror. While still under the stress and excitement of being threatened with a knife, R.F. explained to the 911 operator what had just happened, provided a description of the defendant, and what she could see him doing at the time. Among other things, R.F. reported that she "just had a man come to me with a knife and tried to stab me" and that the defendant was "down the street walking because I sprayed him with some damn mace." At that point, R.F. expressed shock by exhaling and saying, "oh my goodness." R.F. also described, "There he go, right there down the street by the garbage can." While still on the phone with the 911 operator, officers from the Farmington Hills Police Department arrived. Officer Towns was one of the first

officers to arrive and interview R.F. about the incident. R.F., while breathing heavily and talking excitedly, described that the defendant had pulled a knife on her while her window was down and made a motion like he was going to throw it at her. She also described what the defendant said to her and the fact that she sprayed him with mace. At one point, Officer Towns interrupted R.F., who appeared shaken, to ask if she was okay. R.F. let out a big breath and said she was, before continuing to describe what happened.

The government plans to introduce: (1) the audio recording of the 911 call placed by R.F. and (2) R.F.'s statement describing the assault as captured on Officer Towns's body worn camera. These statements are admissible under the present sense impression and excited utterance exceptions to the hearsay rule. Fed. R. Evid. 803(1), 803(2).

The Sixth Circuit has routinely found that 911 calls made within minutes of a startling event are admissible as both an excited utterance and present sense impression exceptions to the hearsay rule. *United States v. Davis*, 577 F.3d 660, 668–70 (6th Cir. 2009); *United States v. Price*, 58 F. App'x 105, 107 (6th Cir. 2003); *United States v. Bickerstaff*, 851 F. App'x 605, 610 (6th Cir. 2021).  R.F.'s statements to Officer Towns which were made within minutes of the incident and also include a contemporaneous description of the defendant's movements are admissible for the same reasons.

### 1. Present Sense Impression

Both the 911 call and R.F.'s statements to Officer Towns are admissible as present sense impressions. Federal Rule of Evidence 803(1) allows for the admission of a present sense impression, which is defined as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). The Sixth Circuit has consistently ruled that 911 calls are admissible under the present sense impression exception to the hearsay rule when they are made within minutes of the event. *See Davis*, 577 F.3d at 668; *Price*, 58 F. App'x at 107. "The underlying rational of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication. There is no *per se* rule indicating what time interval is too long under Rule 803(1)." *United States v. Dean*, 823 F.3d 411, 427 (8th Cir. 2016) (internal quotation marks and citation omitted). Courts do not apply a bright-line rule for specific time frames for admissibility, but it depends on the facts and circumstances of each case. *United States v. Lavato*, 950 F.3d 1337, 1344 (10th Cir. 2020). Rule 803(1) "recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." Fed. R. Evid. 803(a), Advisory Committee's Notes to 1972 proposed rules.

Here, R.F. made the 911 call immediately after the defendant threatened her. And she spoke with Officer Towns within minutes after the incident. Both statements were made "immediately after the declarant perceived it." Fed. R. Evid. 803(1); *see Lovato*, 950 F.3d at 1345 (holding tape of 911 call admissible where four minute delay between shooting and descriptive statements); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995), *vacated on other grounds*, 516 U.S. 1168 (1986) (holding tape of 911 call admissible where seven minutes between husband pointing a gun at wife and her statement); *United States v. Mejia-Valez*, 855 F. Supp. 607, 613–14 (E.D.N.Y. 1994) (holding that tapes of two 911 calls, the first two to three minutes after the shooting and the other approximately16 minutes after the shooting admissible). In this case, both R.F.'s 911 call and her statement to Officer Towns was made within minutes of the incident and before she had the opportunity for "defective or conscious fabrication." *Lovato*, 950 F.3d at 1345. Accordingly, these statements are admissible as present sense impressions under Rule 803(1).

## 2. Excited Utterance

Federal Rule of Evidence 803(2) allows for the admission of an excited utterance, which is defined as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The 'excited utterance' exception is based on the

belief that the statement is reliable because it is made while the declarant is under the stress of excitement. It is unlikely that the statement is contrived or the product of reflection." *Davis*, 577 F.3d at 668 (internal quotation marks and citations omitted). The statement "need not be contemporaneous with the startling event to be admissible under rule 803(2) . . . [r]ather, the utterance must be contemporaneous with the excitement engendered by the startling event." *United States v. Boyce*, 742 F.3d 792, 798 (7th Cir. 2014) (internal quotation marks and citations omitted).

The Sixth Circuit has identified three factors to be considered in determining if the excited utterance exception applies. "First, there must be an event startling enough to cause nervous excitement. Second, the statement must be made before there is time to contrive or misrepresent. And, third, the statement must be made while the person is under the stress of the excitement caused by the event." *Davis*, 577 F.3d at 669 (internal quotation marks and citations omitted). All three factors bear on the ultimate question "whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (en banc).

All three requirements are met here. First, being aggressively confronted by a man using racial slurs and crude language and then brandishing a knife is certainly a startling event. Indeed, neighbors in the area stopped to ask R.F. if she

12

was okay. Second, R.F.'s statements on the 911 call and to Officer Towns were both made before R.F. had time to contrive or misrepresent. The Sixth Circuit has expressly found that a 911 call made within five minutes of a startling event is sufficiently close in time that the caller did not have time to fabricate a story. *Davis*, 577 F.3d at 669; *see Arnold*, 486 F.3d at 184–85 (precise showing of lapse in time between startling event and out-of-court statement not required, only that declarant is still upset and that it is reasonable for her to continue to be upset). Finally, R.F. made both statements while she was still under the stress of being threatened by the defendant as evidenced by the rapid pace of her speech and the occasional loud exhale to release her stress and anxiety. *See, e.g., Arnold*, 486 F.3d at 184–85 (finding 911 call and statement to officers upon arrival at the scene admissible as excited utterances).

For these reasons, the 911 call and R.F.'s statements to Officer Towns are admissible under Rule 803(2) as excited utterances.

### B.    Impeachment of defendant with prior convictions

Federal Rule of Evidence 609(a)(1)(B) provides that evidence of a defendant's felony conviction where the defendant was convicted or released from confinement within the past ten years "must be admitted [for impeachment] in a criminal case [in which the defendant is a witness] if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid.

609(a)(1)(B); 609(b). The Sixth Circuit has set forth several factors for courts to examine in weighing the probative value and prejudicial effect of evidence of a felony conviction, including:

(1) The impeachment value of the prior crime.
(2) The point in time of the conviction and the witness' subsequent history.
(3) The similarity between the past crime and the charged crime.
(4) The importance of the defendant's testimony.
(5) The centrality of the credibility issue.

*United States v. Moore*, 917 F.2d 215, 234 (6th Cir. 1990).

Here, the factors weigh in favor of permitting the United States to use the fact of defendant's prior felony convictions, without introducing the nature of his convictions, to impeach the defendant if he testifies. The United States intends to impeach the defendant with the fact that he had been convicted of three felony offenses: (1) on April 2, 2010 (sentence expired on October 24, 2015); (2) on June 3, 2011 (sentence expired on October 24, 2015); and (3) on September 14, 2018 (sentence expired on March 1, 2022).

First, with respect to the second factor, as the convictions are not particularly old and they are part of a continuous criminal history, their probative value is high.

Second, with respect to the third factor, because the United States is only seeking to impeach the defendant with the fact that he had been convicted of felony offenses, there is no risk of prejudice by any similarity between his past crimes and the charge crimes here.

14

Third, with respect to the fourth and fifth factors, if the defendant testifies, that testimony will be very important to the jury's determination in this case and his credibility will become a central issue at trial. The central fact in dispute in this case is whether the defendant had a knife. The jury will have to weigh whether they believe the victim or the defendant. Thus, the defendant's credibility will be crucial if he testifies and denies having a knife. Where a defendant's credibility is important, prior convictions are highly probative. *See United States v. Arhebamen*, 197 F. App'x 461, 467 (6th Cir. 2006) ("Here, evidence of defendant's prior conviction for absconding . . . was highly probative because defendant's credibility was a central issue at trial."). Thus, the fourth and fifth factors—the importance of the defendant's testimony and the centrality of the credibility issue—weigh in favor of admission of the convictions due to their probative nature.

The first factor, relating to the impeachment value of the prior crime, is largely neutral since the United States is seeking to minimize any prejudice by only using the fact of the defendant's prior felony convictions.

In considering all the factors together, the probative value of the convictions outweighs the prejudice to the defendant. Further any potential prejudice could be mitigated by a limiting instruction prohibiting the jury from considering the convictions for any purpose other than evaluating the defendant's credibility. *See*

*United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001); *United States v. Gaitan-Acebedo*, 148 F.3d 577, 591–91 (6th Cir. 1998).

**C.      Exhibits during opening statement (Fed. R. Evid. 611).**

In its opening statement, the government intends to display exhibits that it will seek to admit during trial. Specifically, the government anticipates displaying a map of the area where the crime occurred as well as a clip from R.F.'s 911 call. The government's opening will be confined to a summary of the issues in the case and the evidence the government intends to offer which it believes in good faith will be available and admissible. *See*, ABA Standards for Criminal Justice 3-5.5 (3d ed. 1993); *Testa v. Mundelein, Illinois*, 89 F.3d 443, 445 (7th Cir. 1996); *see also United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988). In addition, the exhibits that the government plans to use during opening statement will be limited to the exhibits that the defendants have agreed can be admitted.

**D.      Status of motions *in limine* and related agreements**

The government has filed two motions *in limine* that are pending before the Court. First, the government filed a motion for an order precluding the defendant from introducing exculpatory hearsay statements. (ECF No. 29, PageID.77). Upon seeking concurrence from defense counsel as to this motion, Mr. Amberg objected "in the event his statements are used for purposes other than the truth of the matter, such as his state of mind at the time[.]" Second, the government filed a motion for

an order to preclude any evidence and argument relating to punishment (including referencing the "Special Finding" as a sentence enhancement or otherwise related to punishment), collateral consequences of conviction, and jury nullification. (ECF No. 28, PageID.71). Upon seeing concurrence from defense counsel, Mr. Amberg indicated that he does not object to this motion.

In addition, the government indicated to defense counsel that it intended to file a motion *in limine* to preclude the defense from improperly characterizing the government's burden of proof, namely by using a burden of proof chart that defense counsel has used or sought to use in past trials. Mr. Amberg indicated that he does not intend to use such a chart in this trial. Relying on this representation and agreement, the government did not file this motion.

The government also informed defense counsel that it intended to file a motion *in limine* to preclude the defense from arguing or suggesting that intoxication is a defense to Count One, which is a general intent crime. Mr. Amberg agreed that intoxication is not available as a total defense to that charge and that he would not argue that the defendant is "innocent because he was drunk" but that evidence of the defendant's intoxication would be relevant as "greater context of what took place and his mindset." Based on this representation and agreement, the government did not file this motion.

Finally, the defendant has filed a motion *in limine* to exclude the government's proffered 404(b) and bias evidence. (ECF No. 27, PageID.62). The government plans to respond.

## VI.   Conclusion

The government submits this Trial Brief to assist the Court in the above-captioned case.

Respectfully Submitted,

JULIE A. BECK
Acting United States Attorney

Frances Lee Carlson
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313)226-9696
frances.carlson@usdoj.gov

Darrin Crawford
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9549
darrin.crawford@usdoj.gov

Date: February 18, 2025

## <u>CERTIFICATE OF SERVICE</u>

I certify that on Tuesday, February 18, 2025, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the attorney of record.

James W. Amberg
jamberg@amberglaw.net

s/ *Frances Lee Carlson*
Frances Lee Carlson
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
frances.carlson@usdoj.gov
(313) 226-9696
P62624